**AFFIDAVIT OF TASK FORCE OFFICER THOMAS FEEHAN**

I, Thomas Feehan, Task Force Officer, Drug Enforcement Administration, being duly sworn, depose and state as follows:

**Agent Background**

1.     I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal law and duly authorized by the Attorney General to request a search warrant.

2.     I am a Police Officer with the City of Lowell Police Department, where I have been employed since 2015. Since October 2024, I have been assigned as a Task Force Officer with the Drug Enforcement Administration (DEA) New England Field Division (NEFD) Financial Investigation Team (FIT). I graduated the Lowell Police Academy in November of 2012. I worked as a Patrol Officer for the Town of Littleton from November 2012 to May 2015. I began my career as a Lowell Police Officer in May 2015 as a patrol officer where I received assignments throughout the City of Lowell. In November of 2016, I was assigned to the District Response Unit as a District Response Officer (DRO). In November of 2018, I was assigned to the Gang Unit. During my time as a District Response Officer and Gang Unit Officer I have been involved in numerous narcotics investigations and arrests pertaining to illegal drug activity and firearms. In May 2021, I was assigned as Detective in the Special Investigations Section (SIS) investigating crimes involving all aspects of illegal narcotic activity.

3.     I receive annual training at the Lowell Police Department through the In-Service program. I have attended specialized training offered by New England High Intensity Drug

1

Trafficking Area (NEHIDTA) in Clandestine Laboratories, Prescription Drug Crimes, and Drug Investigations. I received specialized training through New England State Police Information Network (NESPIN) for Identifying Impostors. I attended the New England Gang School (40 hours) Street Crimes and Gang Investigator course covering Human Trafficking Investigations, Drug Investigations, Social Media Investigations, and Gang Identification and Interdiction. I have completed the Federal Resources 40 Hour Basic Street Level Narcotics Course. I have attended and completed the 80-hour Top Gun Undercover Narcotics Investigator Course hosted by the Massachusetts State Police.

4.     I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, packaged, distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5.     I have written and/or participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the

2

manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations.  I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests, and participating in court-authorized Title III wiretaps of cellular phones.  I have received extensive specialized training in the field of controlled substance identification, investigation, and enforcement.

6.     Based on my training and experience, I am familiar with the manner and means commonly employed by drug traffickers, weapons traffickers, and money launderers, including those employed to avoid detection by law enforcement.  I am familiar with how drug traffickers often store drugs, weapons, and drug proceeds in storage sites commonly referred to as "stash houses," as well as various methods used to conceal and transport these items.  I am also familiar with the terminology, slang, and coded language commonly employed by these individuals.  I am aware of the prices commonly charged for various illegal narcotics and illegal weapons, the method of packaging, and the jargon used in their trade.   I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.  Similarly, I am familiar with investigations regarding closely associated illegal activities commonly engaged in by drug trafficking organizations, especially the laundering of drug proceeds.

7.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities. I also know that drug traffickers are aware of law enforcement's use of electronic surveillance, and thus, frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information), and use cellular telephones subscribed under a different person's name, in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone.

## Purposes of Affidavit

8.      **Criminal Complaint**:  I make this affidavit in support a criminal complaint charging **Rishel Medina Beltre ("BELTRE")** with conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. 846 (the "Charged Offense").

9.      **Residential Search Warrant**: I further make this affidavit in support of a search warrant for the residence located at **25 Calder Street, First Floor Right Apartment (Apartment "1R") in Dorchester, Massachusetts,** as described in Attachment A (the "Target Location"), because there is probable cause to believe that it contains evidence, fruits, and instrumentalities of the Charged Offense, as described in Attachment B.

10.     As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation. I submit this affidavit for the limited purpose of

4

establishing probable cause for the requested complaint and search warrant. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation.

## Probable Cause

*Background*

11.    On September 23, 2025, the Honorable Jennifer C. Boal, United States Magistrate Judge, authorized a search warrant for location information for cellular telephone number 857-615-1958 being used by an individual known as "George" or "Jorge."  25-MJ-7440-JCB.  My affidavit in support of that warrant is attached hereto as Exhibit 1, and is incorporated fully herein.

12.    As detailed in Exhibit 1, in August 2025, George/Jorge coordinated with a DEA undercover agent to deliver a sample of cocaine in hopes of setting up further multi-kilogram transactions.  On August 26, 2025, a female associated with George/Jorge met with a confidential source (CS, who was acting with the undercover agent) to deliver the sample of cocaine.  The female brought with her a full kilogram brick of cocaine which she carried inside a sling-style bag. After the sample was delivered, the female entered a white Cheverolet van bearing Massachusetts registration 6PSN71, which was occupied by three other men.  The white van drove off and dropped the female off before continuing its travels.  Investigators stopped the white van, identified the three men, and located inside the sling-style bag previously-carried by the female, which was found to contain what appeared to be a kilogram of cocaine wrapped in plastic and dark tape— believed to be the same kilogram the female had shown to the CS.  The driver of the white van was identified as Yeury Soto-Arias, and one of the other male occupants was identified as the charged defendant here, Rishel Medina BELTRE.  Because none of the men had a valid driver's

license the van was impounded and Soto-Arias, BELTRE, and the third man were released. Ultimately, the white van was retrieved from the impound lot and re-registered in another name at the address 951 Hyde Park Avenue, Hyde Park, Massachusetts.

13.     On October 1, 2025, the Honorable Jennifer C. Boal authorized search warrants to obtain precise location information for telephone number 978-833-2579, which was subscribed to "Yeury Arias" and believed to be used by Yeury Soto-Arias. 25-MJ-7449-7500-JCB.  My affidavit in support of that warrant is attached hereto as Exhibit 2, and is incorporated fully herein.

14.     As detailed in Exhibit 2, toll records for Soto-Arias' telephone indicated that, between August 5 and September 23, 2025, Soto-Arias was in contact with George/Jorge's phone (857-615-1958, the subject of Exhibit 1) approximately 5 times via cellular phone.  Additionally, between September 6 and September 18, 2025, Soto-Arias was in contact with George/Jorge's phone via WhatsApp approximately 83 times.

15.     On October 21, 2025, at approximately 9:52 p.m., the precise location information for Soto-Arias' phone indicated it was within 443 meters of the area of 25 Calder Street, Dorchester, Massachusetts. At around this same time, investigators conducting surveillance in the area of 25 Calder Street observed a white BMW registered to Soto-Arias' brother parked near the intersection of American Legion Highway and Calder Street. Investigators observed an unidentified Hispanic female walk out of the white BMW and walk between the triple-decker apartment buildings located at 25 and 27 Calder Street.

16.     Investigators then utilized the court-authorized cell-site simulator to more precisely locate Soto-Arias' phone.  Based on this technique, investigators determined Soto-Arias' phone

was located in or very near to 25 or 27 Calder Street. Based on these observations, I believe Soto-Arias was with his telephone in the area of 25 or 27 Calder Street on October 21, 2025.

17.    At approximately 9:58 p.m., investigators observed a gray Honda CRV pull out of a parking spot bear 25-27 Calder Street and drive away. Investigators followed the Honda CRV to 18 Harvard Street, Dorchester, Massachusetts. There, the Honda CRV parked at the end of a dead-end road. Investigators observed an individual on a moped at the driver's side window of the Honda CRV. After approximately 5 minutes, investigators observed the Honda CRV drive away from Harvard Street. Investigators followed the Honda CRV until, at approximately 10:25 p.m., when investigators observed the Honda CRV pull into the rear parking lot of 951 Hyde Park Avenue—the same address to which the white Cheverolet van had been re-registered after it was retrieved from the impound lot. Investigators observed the occupant of the Honda CRV walk into the building at 951 Hyde Park Avenue. Investigators then traveled into the rear parking lot of 951 Hyde Park Avenue and observed that the Honda CRV was parked next to the same white Cheverolet van bearing Massachusetts 6PSN71—the same van from which investigators had seized a kilogram of suspected cocaine on August 26, 2025.

*October 29, 2025 Events and Lead Up*

18.     On October 22, 2025, DEA investigators in Boston received information from a DEA agent in Mexico City who had, in turn, received information from a confidential source (CS),[1] including a video and an audio recording, regarding kilograms of cocaine located in Boston.  The CS told investigators that the holder of the kilograms was a man named "Jorge," who was located in Boston and looking to sell the kilograms.

19.     The video provided by the CS is less than one minute long and depicts a large clear plastic box of what appeared to be 30 to 40 kilograms of cocaine wrapped in plastic.

20.     The audio voice memo sent to the CS consists of a raspy male voice speaking Spanish who appears to be discussing selling narcotics.  When members of Boston DEA who were involved in negotiating the August kilogram sample with George/Jorge (described above) heard the audio voice recording, they immediately recognized the voice in the memo as the same individual with whom they had spoken in August.

---

[1] The Confidential Source (CS) is a documented DEA confidential source and has been working with investigators since August 2024. The CS is cooperating in order to receive monetary compensation for their information and services regarding worldwide drug trafficking network operating in the United States, Mexico, Colombia, and various parts Central America. The CS has a criminal history of arrests and/or convictions which include charges for alien inadmissibility where the CS voluntarily departed the United States in 2022. The CS's information has been shown to be reliable in this investigation and the information provided by the CS pertaining to this investigation has been corroborated. No information has been derived by DEA that would indicate that CS is providing false information in any manner.

21.     Shortly thereafter, CS sent investigators the telephone number 857-615-1958—the same telephone number investigators had used to coordinate the August sample with George/Jorge, and the telephone number for which the Court previously authorized a search warrant for location information. *See* Ex. 1.

22.     Investigators in Boston then utilized a confidential source (CS-2)[2] to contact the 857-615-1958 number discuss obtaining a sample of cocaine.   During these conversations, the holder of the 857-615-1958 phone, believed to be Jorge, agreed to provide the sample on October 29, 2025.

23.     On October 29, 2025, investigators met with CS-2, searched CS-2 for contraband with negative results.  CS-2 was equipped with audio/video transmitting/recording device. CS-2 again contacted the 857-615-1958 number to coordinate logistics and was told by Jorge to meet at a restaurant at 830 Blue Hill Avenue in Dorchester.  This restaurant is on Blue Hill Avenue at the intersection with Calder Street (the street housing the Target Location).

24.     At approximately 8:15 a.m. on October 29, 2025, investigators established surveillance in the area of 951 Hyde Park Avenue. At this time, investigators observed a Honda CRV bearing MA registration 4FFF37 in the rear parking area of 951 Hyde Avenue.  This is the same Honda CRV observed on surveillance on October 21, 2025, detailed above.  Shortly

---

[2] CS-2 has been working with investigators for approximately 10 years. CS is cooperating in exchange for compensation and has been paid between $250,000-$500,000 by DEA during that time. CS-2 was previously based in Colombia but moved up to Boston within the past year.  CS-2 has no criminal history.  Information provided by CS-2 is believed to be reliable.

thereafter, investigators observed a Hispanic male exited the front of 951 Hyde Avenue carrying a brown Marshals shopping bag and get into the Honda CRV. Investigators maintained surveillance of the Honda CRV as it drove around Boston and ultimately arrived and parked in the area of 25 Calder Street (the premises in which the Target Location is located) at approximately 12:25 p.m.

25.     Moments later, two unknown Hispanic males exited the Honda CRV and entered the front door of 25 Calder Street. At approximately 12:30 p.m., investigators observed a Hispanic male wearing a grey puffy style jacket with a hat (later identified as BELTRE) walk from the area of a bus stop in the area of American Legion Highway and Blue Hill Avenue.  Investigators observed BELTRE walk toward the rear of 25 Calder Street and enter the rear left door on the first level—the door to the Target Location.

26.     Approximately 20 minutes later, investigators observed BELTRE exit from the area of the same first level door and walk through a rear path towards a Mobil Gas Station onto Blue Hill Avenue.  BELTRE walked into the restaurant meeting location located at 830 Blue Hill Avenue.

27.     Around this time, other investigators observed two other unknown Hispanic males exit the same rear first floor door of 25 Calder Street—the door from the Target Location.

28.     At approximately 12:55 p.m., investigators observed the same two males who were operating the Honda CRV, exit the front door of 25 Calder Street and entered back into the Honda CRV.  Surveillance was maintained and investigators observed the vehicle park on Vesta Road in the area of Blue Hill Avenue.

29.     At approximately 12:56 p.m., investigators observed a blue moped driven by an unknown male with a red puffy style jacket drive down the alley next to 25 Calder Street.

10

Surveillance was maintained as the moped drove around this area and ultimately parked in the of the Honda CRV on Vesta Road. A moment later, investigators observed the driver of the moped pass a large white bag into the passenger side of the Honda CRV. The moped then departed the area. The meeting between the moped and the Honda CRV lasted approximately 30 seconds.

30.     Around this time, CS-2 reported to investigators that BELTRE stated he was going to get the two kilograms from which CS-2 could obtain a sample.  Investigators observed BELTRE walk out of the restaurant and walk toward Vesta Road, where BELTRE then entered the Honda CRV.

31.     At approximately 1:10 p.m., BELTRE exited the Honda CRV while carrying a large, weighted down white bag.  BELTRE walked back towards the area of the restaurant where he met with CS-2 outside. Investigators observed CS-2 and BELTRE enter the undercover vehicle (UC vehicle) while the undercover driver left the vehicle and walked into the restaurant.

32.     During the meeting inside the UC vehicle, investigators monitoring the audio/video transmitting device observed BELTRE take out two rectangle shaped objects from inside a neon bag, which was further inside the white bag. BELTRE then utilized a large knife to cut into both rectangle shaped objects.  CS-2 reported that in the vehicle BELTRE scraped a sample off of the two bricks and provided the sample to CS-2, who stored it in plastic bags CS-2 had brought with him/her.

33.     At approximately 1:21 p.m., BELTRE exited the UC vehicle while carrying the large weighted down white bag and walked back towards Vesta Road where he again entered the Honda CRV. Shortly thereafter, the Honda CRV departed and investigators maintained surveillance and observed the vehicle to conduct "counter surveillance" type driving maneuvers.

11

34.     A few minutes later, investigators observed BELTRE exit the Honda CRV while carrying the large white bag on Blue Hill Avenue near Abbot Street.  BELTRE walked across Blue Hill Avenue and into the parking lot of the Mobile Gas Station retracing his steps back toward the Target Location.

35.     At this time, investigators approached BELTRE and announced, "Police, don't move."  At this, BELTRE turned the opposite direction and began to run away from investigators. Shortly thereafter, he was apprehended by law enforcement and was placed under arrest.

36.     As he was fleeing, BELTRE dropped a large white bag, which investigators recovered and found two rectangular shaped objects wrapped in black tape. Also in the bag, investigators located a large knife. Investigators conducted a field test of the substance in the rectangular objects dropped by BELTRE, which indicated a positive result for cocaine.

37.     Based on the above, I believe BELTRE possessed kilograms of cocaine and delivered a sample to CS-2 as coordinated by Jorge. I further believe the kilograms of cocaine were stored within the Target Location prior to BELTRE meeting with CS-2, and that BELTRE was intending to return the two kilograms to the Target Location after delivering the sample before he was stopped by investigators.

38.     While investigators were on scene outside the Target Location building, a female occupant of the Target Location arrived.  The female disclosed to investigators that she lived in the Target Location and rented a room within the Target Location.  She stated that there are two other bedrooms but that she does not know the occupants of those rooms.  She has been renting the room for approximately one month.  The female stated that she has access to the bedroom she rents, as well as the kitchen and bathroom.  The female signed a written consent form to search the

Target Location's common areas and her bedroom.  With this consent, investigators entered the Target Location.  Investigators conducted a brief protective sweep of the Target Location for officer safety.

39.    The Target Location is laid out as follows: when entering the front right door on the first floor at 25 Calder Street, one enters a long hallway with a kitchen at the end.  On the right is a bedroom occupied by the female, followed by a second bedroom, a common closet, a third bedroom, a shared bathroom, and then a shared kitchen.  The kitchen has a door that exits to the rear of the building—the door in which investigators had seen BELTRE enter earlier.

40.    While conducting the protective sweep, investigators immediately observed what appeared to be green cellophane wrap overflowing out of the garbage can in the common kitchen area.  Based on my training and experience I believe this green cellophane is a common type of wrapping material used to package and conceal kilograms of narcotics.

41.    While also conducting the protective sweep, investigators observed a large clear box on the floor of the third bedroom (the door to which was closed but not locked) which matched the appearance of the box depicted in the video obtained from the Mexico CS.  Inside the box, in plain view, were multiple wrapped kilograms of suspected narcotics—again consistent with the video.  Investigators also recognized the flooring in the second bedroom as matching the appearance of the flooring in the video from the Mexico CS.

42.    Based on the above, I believe BELTRE, "Jorge," and other members of the conspiracy use the Target Location in furtherance of their drug trafficking activities, including to store and package narcotics, and I believe evidence, fruits, and instrumentalities of the Charged Offense will be found within the Target Location.

13

**Drug Traffickers' Use of Residences/Stash Locations and Cellular Telephones**

43.    Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.  As detailed above BELTRE came from the Target Location prior to meeting with the confidential source, which I believe indicates that BELTRE, like other drug traffickers, utilizes this residence/stash location in furtherance of the Charged Offense.

44.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences and stash locations records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe"

14

records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

45.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences and stash locations either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences. Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

46.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept at their residences and/or in the stash locations. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers

to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

47.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence and/or stash location of the drug trafficker.

48.     Drug traffickers maintain weapons, including firearms and ammunition, to protect their drugs and/or drug proceeds and to threaten to harm or actually harm those who interfere with drug traffickers' business.   I know that drug traffickers often maintain these weapons in their residence, stash locations, and/or on their persons to protect themselves as well as their money and drugs.

49.     Finally, evidence of drug crimes can be found in the cell phones and smart phones. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. From my training, experience, and information provided to me by other agents, I am aware that

individuals commonly store records of the type described in Attachments B-1 and B-2 on their cellular telephones.

50.    It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

51.    As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

52.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded

17

to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

53.    I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the targets of this investigation. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related evidence typically have been recovered in both conventional and electronic formats:

      a.   controlled substances;

18

b. paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

c. books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

d. personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e. cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f. documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g. cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h. firearms and other dangerous weapons; and

    i.   identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

## CONCLUSION

54.    Based on all of the above, there is probable cause to believe Rishel Medina BELTRE conspired with "Jorge" and others to distribute and possess with intent to distribute controlled substances.

55.    There is also probable cause to believe that Rishel Medina BELTRE, Jorge, and their coconspirators use the Target Location in furtherance of the Charged Offense and that evidence, fruits, and instrumentalities of the Charged Offense, as described in Attachment B, will be located in the Target Location described in Attachment A.



Respectfully submitted,

/s/ Thomas Feehan
_____

Thomas Feehan
Task Force Officer
Drug Enforcement Administration

Sworn to via telephone in accordance with Fed R. Crim. P. 4.1 on October 29, 2025

_____
Honorable M. Page Kelley
United States Magistrate Judge

## ATTACHMENT A

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

The premises to be searched are located at 25 Calder Street, First Floor Right Hand Apartment (Apartment "1R"), Dorchester, Massachusetts (the "Target Location.").  25 Calder Street is a triple-decker, multi-unit apartment building with pale yellow siding as depicted below.



The Target Location is accessed by entering a common front door at 25 Calder Street, which opens into a common entryway with two white doors labeled "1L" on the left, and "1R" on the right.  The Target Location is accessed via the door on the right labeled "1R" as depicted in the first photo below).   The Target Location is also accessible via a door on the first floor rear of the building at 25 Calder Street—this door is the left hand door (as depicted in the second photo below).



## ATTACHMENT B

(Items to be Seized)

All records from August 2025, to the present, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Section 846 (conspiracy to distribute and possess with intent to distribute substances, the "Charged Offense"), including:

1.      Controlled substances and controlled substances paraphernalia.

2.      Books, records, receipts, notes, ledgers, and other papers relating to the distribution of narcotics, personal telephone/address books, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

3.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

4.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

5.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

6.      Photographs, videos, or other records concerning the Charged Offense, or the identities of coconspirators.

7.      Cellular telephones believed to be used by Rishel Medina Beltre and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing money laundering and/or referencing individuals engaged in money laundering, located in the memory of any mobile telephone, including but not limited to:

a.    Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

b.    Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.    Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing the Charged Offenses and/or referencing individuals engaged in the Charged Offense.

d.    Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing the Charged Offense;

e.    GPS data;

f.    Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing the Charged Offense or individuals engaged in the Charged Offense;

g.    Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing the Charged Offense;

h.    All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.    Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

**Search and Seizure of Electronically Stored Information ("ESI")**

The items to be seized from the Target Location includes any cellphones, computer devices, and storage media which are reasonably believed to be owned or used by Rishel Medina Beltre and that may contain any electronically stored information falling within the categories set forth in this Attachment above, including, but not limited to, cellphones, desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners. In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

Included within the items to be seized from the Target Location are:

1.      Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.      Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.      Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

### Review of Electronically Stored Information ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

•       surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

•       opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

•       scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

•       performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

•       reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Section II of this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

During the execution of the search of the Target Location described in Attachment A, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using biometric features, this warrant authorizes law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of Rishel Medina Beltre to the fingerprint scanner of the devices found at the Target Location; (2) hold the devices found at the Target Location in front of the face of Rishel Medina Beltre and activate the facial recognition feature; and/or (3) hold the devices found at the Target Location in front of the face of Rishel Medina Beltre and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.  The warrant does not authorize law enforcement to compel that any person state or otherwise provide the password or any other means that may be used to unlock or access the devices.  Moreover, the warrant does not authorize law enforcement to compel any person to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.  This warrant does not authorize the use of unreasonable physical force to secure compliance with its authorizations.

Law enforcement personnel are authorized to change device settings on any seized device(s) to disable "Stolen Device Protection."

**Return of Seized Computer Equipment**

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

4

Law enforcement personnel is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant until the completion of its investigation or the completion of any trial, appeal, or collateral proceeding involving the records and data seized, after which time law enforcement personnel will dispose of the account duplicate consistent with the agency's evidence disposal policy.